# The City of Reading *versus* Keppleman.

1. By its original charter Reading was authorized to improve, &c., the streets: by subsequent revising acts the city was continued subject to all the duties, &c., "incumbent upon said city as a municipal corporation." These acts also directed the appointment by the councils of an engineer to plot and grade the streets of the city, file the plot, &c., in the Court of Quarter Sessions, subject to approval or alteration by the court, and "thenceforth * * the streets, &c., so filed and recorded should" be adjudged established and fixed. *Held*, that the provisions were prospective and did not suspend the powers of the councils until the completion and final adoption of the city plan.

2. No engineer having been appointed or plan made, filed and "adjudged established," the councils had authority to raise the grade of a street and the city was not liable for damages to a lot-owner injured thereby.

3. The charter and revised charter of Reading construed as to the authority to regulate streets, &c.

March 1st and 2d 1869. Before THOMPSON, C. J., READ, AGNEW and WILLIAMS, JJ. SHARSWOOD, J., at Nisi Prius.

Error to the Court of Common Pleas of *Berks county:* No. 67, to July Term 1868.

This was an action on the case commenced November 26th 1864, by John Keppleman against the City of Reading for injury to his foundry and lot, situate on Fifth street, north of Elm street in that city. In or about May 1861 the plaintiff built his foundry. In the year 1863 the grade of Fifth street in front of his lot was, by order of the city councils, raised about one foot and four inches, and in October 1864 the grade was again raised by the same authority about three feet and two inches more, making the whole increase about four and one-half feet. This increase he alleged was without authority of law, and he brought this suit to recover damages for the injury. He gave evidence of the raising of the

[Reading *v.* Keppleman.]

grade, and the amount of injury sustained by him.   The principal question was the authority of the councils to alter the grade.

The Act of March 29th 1813, § 6, Pamph. L. 213, conferred on the municipal authorities of the *borough* of Reading power to provide for "improving, repairing, cleansing and keeping in order the streets, lanes, alleys and highways," &c.   By § 9 of the Act of March 16th 1847, Pamph. L. 409, incorporating the City of Reading, it is provided that the select and common councils "shall have, hold and enjoy all the powers now vested in the borough of Reading, which are hereby transferred to and vested in the said councils."

The city charter was revised by Act of Assembly, approved March 13th 1861, Pamph. L. 104, the 1st section of which provides that the city of Reading "as such shall exercise and enjoy all the rights, immunities, powers and privileges, and shall be subject to all the duties and obligations, now incumbent upon and appertaining to said city as a municipal corporation."

The 41st section provided, "That the councils, within ninety days after the passage of this act, are hereby authorized and required to appoint a competent civil engineer, whose duty it shall be, as soon as the same can be done, to survey and mark the lines of all the streets and highways of the city now open or intended to be opened for public use within the said city; and also survey and lay out the width and extension of the same, or such new streets, avenues and highways, within said city, as the councils shall deem necessary, for a regular and convenient town plan, and for the more equal distribution and ready discharge of the waters thereof; and to regulate the height, ascent and descent of said streets, avenues and highways, and of the gutters, sidewalks and footways thereof; and for that purpose said engineer shall have full power and authority to enter upon the land of any person or persons within the said city; and when the said survey and regulations shall be completed, the said engineer shall make or cause to be made, duplicate drafts or plans thereof, with every position and explanation necessary for a full understanding of the same, distinctly designating where the new streets, avenues and highways shall hereafter be opened; and one of the said drafts or plans shall be returned to the councils, who shall keep the same in such places as they shall fix upon; and the other of the said drafts or plans shall be returned to the clerk of the Court of Quarter Sessions of the county of Berks, to be filed in his office for public inspection and examination; and it shall be the duty of the said councils to give at least thirty days' previous notice, that on a certain day to be appointed by the court, the court will hear any objections that may be made thereto by any freeholder or citizen of the said city, and the court shall, at the time appointed, adjudge and determine whether any and what alterations shall be made therein, and shall

direct the draft or plan, with such alterations as shall be made, to be recorded in the office of the clerk of said court; and thenceforth all the streets, avenues and highways, as therein contained, shall be for ever deemed, adjudged and taken to be public highways, and the survey and regulations of the said streets, avenues and highways, so returned and recorded, shall be, and remain, unalterable; and in case the city councils, by themselves, or their officers, shall deviate from the regulations of the streets, avenues and highways, so as aforesaid established, and damages should accrue to the property of any person or persons, in consequence thereof, the said city shall be liable for the payment of such damages; and all streets, or highways, not retained in the said draft or plan, as such, shall be and the same are hereby vacated; and inasmuch as the public convenience will for the present be answered by a certain knowledge where and in what manner streets, avenues and highways will, in future, run," &c.; the section further provides for the future opening, &c., of streets not at once necessary.

Sect. 42 provides for assessing and paying damages for opening, &c., "upon the draft being recorded as provided aforesaid," &c.

The 58th section provided, "That all acts and parts of acts, inconsistent with this act, are hereby repealed: *Provided*, That the repeal of said acts shall not affect any act done, or any right accruing, or accrued, or established, or any suit or proceeding had or commenced in any civil case before the time of the repeal; and no offence committed, and no penalty or forfeiture incurred under the acts hereby repealed, shall be affected by the repeal; and no suit or prosecution pending at the time of the repeal for any offence committed, or for the recovery of any penalty or forfeiture incurred under the acts hereby repealed, shall be affected by such repeal: *And provided further*, That the ordinances now in force in said city shall continue in force, so far as the same are not inconsistent with this act, until the same shall be repealed, altered or supplied, under the authority given to the councils of said city."

The city charter was again revised by Act of April 26th 1864, Pamph. L. 583. The 1st, 44th and 62d sections of this act correspond with the 1st, 41st and 58th sections respectively of the Act of 1861; except that the Act of 1864 limits no time within which the engineer shall be appointed.

Section 61 of the Act of 1864 provides, "That this act and the powers and authorities herein vested in the said city, shall not be impaired, affected, defeated or destroyed, by any neglect or omission to appoint all, or any of its officers at the time or times allotted for the same; and in case of any such neglect or omission, the mayor of the said city shall forthwith take all necessary measures to cure and supply such defects and omissions, giving due notice thereof."

The councils having determined in 1863 to widen and fill up

[*Reading v.* Keppleman.]

Fifth street north of Elm street, in that year and in 1864 made various appropriations, the last one on the 29th of October 1864, being "to complete the improvement upon Fifth street beyond Elm." No civil engineer had been appointed under the Acts of 1861 or 1864 at the time of the raising of the grade complained of, nor had there been any survey and plan of the city made, as required by the Acts of Assembly.

Woodward, P. J., after referring to the nature of the plaintiff's claim and the evidence, charged :—

"The general rule of law that a municipal corporation is not liable for consequential damages to private property by an alteration in the grade of a street, is too well settled in Pennsylvania to be questioned. Ordinarily the corporate authorities have entire control of all subjects of this kind. It is claimed on the part of the plaintiff in this case, however, that his rights stand on exceptional grounds. While the charter of the borough of Reading and the act incorporating the city of Reading, which have been given in evidence, gave full power to the municipal officers to regulate the streets within the limits of the corporation, and to make such alterations and improvements as they should deem expedient, it is contended that when the work was done on Fifth street, that is now in question, the rights of these officers had been limited by special legislation."

The judge then stated the provisions of the Acts of Assembly and proceeded :—

["The effect of this legislation was to provide a special and exceptional mode for establishing the grades of the streets of the city of Reading. It modified the provisions of previous statutes, which gave the control of all plans of permanent improvement to the city councils. It left, however, the ordinances which related to the repairs of the existing streets in full force. Notwithstanding the Acts of 1861 and 1864, it still remained their duty to maintain the highways of the city in a condition to meet the necessities and convenience of the community, and to preserve the travelling public from risk and danger. Beyond that their power did not extend. The duty of regulating streets, of fixing their height, ascent and descent, of establishing permanent grades, and of making improvements for the purpose of adjusting those grades, was at least suspended while action was pending under the Acts of 1861 and 1864. The question upon which the jury will be required to pass, involves an inquiry into the nature and character of the work done on Fifth street, for the consequences of which, to his property, the plaintiff has brought this suit.

"It is not pretended that this work was done by the city in view of any plan fixed by the general survey which was required by the acts recited. No steps are shown to have been taken, either by the city engineer, the city councils, or the Court of

[Reading *v.* Keppleman.]

Quarter Sessions, towards the establishment of that plan. What then was the character of the work? Was it intended to alter and change the grade of Fifth street for purposes of permanent improvement? If so—if the jury find that the city councils and their officers were attempting to perform duties, which the statutes had imposed upon the city engineer and the corporate authorities, to be performed in a special way—and if they find that injury resulted to the plaintiff, in consequence of their unauthorized act, he is entitled to recover such damages as under the evidence they shall find that he sustained. If on the other hand, it shall appear from the evidence that the work done consisted only of repairs that were reasonably necessary, the verdict should be for the defendants. If the street was in a dangerous condition, as has been stated by Adam Fox, it was not only within the power, but it was the duty, indeed, of the city councils, to make it safe. If, in rebuilding the culvert, it was necessary to raise the bed of the street in front of the foundry, to the extent proved by the witnesses, in order to make the culvert available, then whatever the consequential damage to the plaintiff, he cannot recover. If there was a reasonable necessity for what was done, they were acting under charter powers, which remained vested in them. If they transcended those powers; if without the existence of any reasonable necessity, they injured the plaintiff by an alteration in the grade of the street, made for the mere purpose of permanent improvement, that was within the scope of the statutory powers conferred on the city engineer, he would be entitled, to the extent of the injury caused by such permanent improvement, to compensation. For the consequences of work done in view of a reasonable necessity for repairs, he can have no right to recover. For the consequences of work done beyond that of work done in view of no such necessity, he would be entitled to such damages as the jury find to be proved."]      *       *       *

The jury found for the plaintiff $1050.

The defendant took a writ of error, and assigned for error the part of the charge included in brackets.

*H. Maltzberger* and *J. B. Bechtel* (with whom was *J. S. Richards*), for plaintiff in error, referred to the several Acts of Assembly; also O'Conner *v.* Pittsburg, 6 Harris 187; Green *v.* Reading, 9 Watts 382; Mayor *v.* Randolph, 4 W. & S. 514; Henry *v.* Pittsburg & Alleg. Bridge Co., 8 Id. 85; Monongahela Nav. Co. *v.* Coons, 6 Id. 101.

*G. G. Barclay* and *J. Hagenman* (with whom was *A. B. Warner*), for defendant in error, cited Green *v.* Reading, O'Conner *v.* Pittsburg, *supra;* Stewart's Appeal, 6 P. F. Smith 422; Commonwealth *v.* Pittsburg and Connellsville Railroad, 12 Harris

159 ; Commonwealth *v.* Erie and N. East Railroad, 3 Casey 339 ; Philadelphia and Trenton Railroad, 6 Whart. 46 ; Pittsburg and Connellsville Railroad *v.* Clark, 5 Casey 146 ; Act of March 21st 1806, § 13, 4 Sm. L. 432, Purd. 41, pl. 5.

The opinion of the court was delivered, May 11th 1869, by

AGNEW, J.:—A careful examination of the revised charters of the city of Reading, passed in 1861 and 1864, leads to the conclusion that the provision in the 41st section of the former and 44th section of the latter act, for a survey and plan of the city, is prospective in its operation on the power of the city to improve the grades of the streets. We think the court below erred, therefore, in instructing the jury that the revised charter suspended the power of the city to raise and grade Fifth street. The obvious purpose of the sections referred to, was to provide for a complete survey and plan of the city for its future government, including the widening and vacating of old streets, and alterations of their grades if necessary, and the location and grades of new streets. This survey was intended to be filed in a public office, in order to furnish a permanent record of the plan of the city, its streets and alleys, and their grades, and thus to give notice to citizens that they might govern themselves by it in the location of their buildings and improvement of their property. The work to be done by the city engineer was to be one of time and labor, requiring much consideration and reflection to finish and perfect it. He is to survey out and mark the lines of the streets, old and new, lay out their width and extent, and do everything necessary for a regular and convenient town plan, and for the distribution and discharge of the waters thereof, and to regulate the height, ascent and descent of the streets, gutters and footways. When all should be completed, he was required to make out duplicate drafts, and deposit one in the clerk's office of the Court of Quarter Sessions. After notice, the court shall hear all objections, and determine any alterations. It is only after all this has been done, and the plan recorded in the clerk's office, the law directs that "*thenceforth* all the streets, avenues and highways, and the survey and regulations of the streets, avenues and highways, so filed and recorded, shall be decreed and adjudged *established* and *fixed.*" Then it was, that the power to alter or deviate from the plan ceased, and the city was made liable for any injury arising from alterations or deviations authorized by councils.

That the revised charters were not intended to suspend the existing powers of the city over the streets and highways in use, is evident, not only from the prospective character of the city plan, which was without operation till its completion and final adoption, but from the clauses in the revised acts preserving these powers. The first section of the Act of 1861 and that of 1864 (not cited

[Reading v. Keppleman.]

in the argument), provides, that the city of Reading "shall have, exercise and enjoy, all the rights, immunities, powers and privileges, and shall be subject to all the duties and obligations now incumbent upon, and appertaining to said city as a municipal corporation." This preserved to the city all its powers under its charter of 1847, except so far as modified by the revised acts. The repealing clause of the 58th section of the Act of 1861, and 62d section of the Act of 1864, is only, of all acts and parts of acts, inconsistent with this act. The revised acts themselves give all the enlarged powers of a city for its benefit, regulation and good government. The powers of the city over the streets for improvement, regulation, grading, &c., therefore continue, except so far as modified by the 41st and 44th sections of the respective acts. These sections are prospective in their operation, and are mere limitations of a power otherwise plenary. The limitation in each of these sections is upon the alteration or deviation from the regulation of the streets, avenues and highways, "so as aforesaid established," which implies, therefore, that the restriction does not take effect until the survey and plan are established. Beside the clauses of the revised acts referred to, there are others bearing strongly on this interpretation. The repealing section of both, provides, that "the repeal of said acts shall not affect any act done or any right accruing or accrued, or established." Also, that "the ordinances now in force in said city shall continue in force so far as the same are not inconsistent with this act, until the same shall be repealed, altered or supplied, under the authority given to the councils of the said city." Thus, the ordinances under which the committee of highways and the street commissioner acted, and by which the appropriations were made to the work, were all preserved in full force, until, by the completion and final adoption of the survey and plan, they became superseded or modified so far as inconsistent with the provisions of the 41st and 44th sections referred to. The change of the grade of Fifth street in 1863-4, was not an alteration or deviation from the city plan, for none then existed or had been established under the 41st and 44th sections.

The reason and necessity of the thing require this interpretation. It cannot be supposed the legislature intended to withdraw all the existing powers of the city over its streets before the plan became established. The 35th section of the Act of 1847 and 57th of the Act of 1861, forbid such an intention. By these sections all doubts are to be resolved favorably to the corporation in courts of law and equity. For these reasons we think the court below erred, and the judgment must be reversed, and *venire de novo* awarded.